## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 07 2017, 6:10 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT FATHER

Paula M. Sauer
Danville, Indiana

ATTORNEY FOR APPELLANT MOTHER

Jeffery A. Earl
Danville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re: A.L., a Child Alleged to be a Child in Need of Services,

L.L. (Father) and A.L. (Mother),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

November 7, 2017

Court of Appeals Case No. 32A01-1706-JC-1325

Appeal from the Hendricks Superior Court

The Honorable Karen M. Love, Judge

Trial Court Cause No. 32D03-1610-JC-122

**Baker, Judge.**

[1] L.L (Father) and A.L. (Mother) appeal the trial court's order finding their minor child, A.L. (Child), to be a child in need of services (CHINS).[1] The parents argue that there is insufficient evidence supporting the trial court's CHINS adjudication. Finding the evidence sufficient, we affirm.

## Facts

[2] Mother and Father are married and have three children, two of whom are adults and one of whom is Child, who was born in February 2008. Father's job requires him to travel out of town overnight during the week, so Mother is Child's primary caregiver.

[3] Mother has a prior conviction for operating while intoxicated (OWI) and drinks about three glasses of wine every day. Father stated that she has been diagnosed with bipolar disorder but there is no evidence in the record that she is receiving mental health treatment.

[4] On August 25, 2016, Mother drove herself, Child, and her two- or three-year-old grandchild to the emergency room because she had an undisclosed physical ailment. The nurse who attempted to care for Mother was so concerned about her behavior that the nurse contacted Rebecca Saylor, a hospital social worker, to evaluate Mother's mental health. By the time Saylor arrived at the emergency room, Mother and the children had left. But they soon returned,

---

[1] Father and Mother are represented by different attorneys. Father's attorney drafted the appellant's brief in this case and Mother later joined in that brief by permission of this Court.

and Mother began accusing hospital employees of stealing her bank statement. Saylor observed Mother to be "angry, using explicit language," loud, aggressive, and upset. Tr. p. 51. While Mother was yelling at hospital employees, her grandchild was unattended in the waiting room and Child was trying to talk to Mother and get her attention so that they could leave. Hospital security personnel became so concerned about Mother's aggressive behavior that they asked her to leave.

[5] Saylor was concerned about the safety of the children in Mother's care based on her behavior and possible intoxication. She voiced her concerns to the security personnel but they "overruled" her because they were "concerned for safety" based on Mother's aggressive behavior. *Id.* at 54.

[6] Someone at the hospital notified law enforcement, and at some point, Danville Police Officer Jerry Cunningham received a dispatch about a possible driver under the influence with two small children in the vehicle. Around 8:00 p.m., he observed a vehicle that matched the description in the dispatch and pulled the vehicle over. The vehicle had been driving at a high rate of speed and did not have its headlights turned on. The driver, later determined to be Mother, "was upset, very agitated and appeared to have a strong odor of alcohol on her. Her eyes were bloodshot, appeared to be, in my opinion, intoxicated." *Id.* at 62. Officer Cunningham observed two children in the backseat of the car and noticed that "[t]hey were both crying and seemed to be very afraid." *Id.* at 63.

[7] Officer Cunningham asked Mother for contact information for an adult who could come pick up the children. She was uncooperative, stating "she didn't know any of the phone numbers. She had a cell phone with her and we made several attempts to try to get her to cooperate with us . . . she wouldn't unlock her phone to let us even try to get a number from her." *Id.* at 65. At some point, Mother's adult daughters arrived at the scene to pick up the children, though the record does not reveal who contacted them or how the phone number was obtained. Throughout the traffic stop, Mother was "very uncooperative . . . she was loud, and she cried, and she was [sic] abusive language, cussed at us . . . ." *Id.* at 66.

[8] At some point, Avon Police Officer Alex Howell also responded to the scene. When he encountered Mother, he concluded that she was intoxicated because of an "[o]dor of alcohol emanating from her person, unsteady balance, glassy eyes, slurred speech, [and] abusive attitude towards responding officers." *Id.* at 75. Officer Howell performed three field sobriety tests. Mother claimed she was unable to perform the horizontal gaze test because of an eye condition. She failed to complete the heel to toe step test because she could not or would not stand still long enough to listen to all the officer's instructions. And she failed the third test, which was the one-leg stand test. Officer Howell then placed Mother in handcuffs and transported her back to the hospital for a blood draw. She continued to be combative, pulling away from the officers, refusing to place her hands behind her back, and refusing to get into the police car.

[9] Social worker Saylor testified that when police brought Mother back to the hospital (her third visit that day), Mother was still "[v]ery angry, just belligerent," and continued to yell and cuss. *Id.* at 55. Officer Howell agreed, stating that Mother was "[s]till physically combative" and "verbally abusive towards me" when they arrived at the hospital. *Id.* at 80. At one point, she "smacked" the officer's hand and grabbed his wrist. *Id.* Eventually, Officer Howell transported Mother to the jail, where she was so combative with jail staff that she "had to be taken to a padded room to give her some time to calm down before she could be taken back out and allowed to complete the booking process." *Id.* at 81. Throughout the process, Mother expressed no concern about the children or their whereabouts to Officer Howell. Mother's blood alcohol content was later revealed to be .152—nearly twice the legal limit. At the time of the CHINS factfinding hearing, Mother was still facing charges stemming from the incident for two counts of Level 6 Felony OWI with a minor passenger and for one count of battery on a law enforcement officer.

[10] On August 25, 2016, the Department of Child Services (DCS) received a report regarding Child based on the OWI incident. Family Case Manager Stephanie Graham made multiple attempts to contact the parents, including leaving voicemails, going to their residence three times, and leaving a note with her contact information at the family's home. No one responded to her communication attempts until September 8, when Graham again went to the home and they answered the door. Both Mother and Father were home.

[11] Father explained to Graham that he is frequently gone for multiple nights at a time when he travels for work. He stated that he is aware that Mother drinks wine but did not know how much she generally drinks. When asked whether Father seemed concerned that the OWI incident had occurred, Graham responded that "He kind of seemed like it didn't have anything to do with him and he wasn't really expressing deep concern for his child." *Id.* at 108.

[12] Throughout Graham's time at the residence, Mother was agitated, angry, and disruptive. Mother insisted that the person who left the DCS letter at her home was a man and refused to accept that it was Graham who had done so. At one point, Mother slammed the door and stated she would no longer speak with Graham. Father intervened to try to calm Mother down.

[13] On October 17, 2016, Graham returned to the home to inform the parents that DCS had decided to file a petition alleging Child to be a CHINS. Mother and Father were both home. The encounter occurred in the early afternoon, and Mother admitted that she had already consumed three glasses of wine that day. *Id.* at 112. Police Officer Jason Wright had accompanied Graham to the home and he observed Mother to be angry and agitated. In Officer Wright's opinion, Mother appeared to be intoxicated. Officer Wright testified that Mother and Child walked out to the mailbox and, as they were returning to the house, Mother "goes [']oh look at me, I'm so drunk['] and walked into the house." *Id.* at 92. Graham performed a mouth swab drug test, which later revealed that her blood alcohol level was between .04 and .08. On October 20, 2016, DCS filed a petition alleging Child to be a CHINS.

[14] At some point, Graham spoke with Father on the phone. He told Graham that "he believes that she may be bipolar and that her doctor had suggested that she may be bipolar." *Id.* at 116. Father did not express any concern about leaving Child in Mother's care with her drinking. Graham was concerned about Father's willingness to step in because

> he didn't show a great concern for [Child]. He didn't have concerns that [Mother] would drink while he was gone. I mean he—he just kind of said [']I don't even know why I need to be involved with this kind of a situation['] because he was not arrested, he was not pulled over, he was not drinking, so he didn't understand that, you know, he needed to be the caregiver and be the father.

*Id.* Graham asked him about Mother's arrest for OWI with Child present, wondering if Father had a concern about that situation, and "[h]e stated that he did not." *Id.* at 121.

[15] Graham observed that Child was excessively withdrawn during one of her home visits. At some point, Graham spoke with Child, who told Graham "that Mom does drink wine and she acts different when she drinks wine." *Id.* at 126.

[16] At some point, Graham went back to the family's residence to create a safety plan designed to ensure Child's safety when she was home alone with Mother. The team created a plan whereby, when Father was traveling out of town, one of Mother's adult daughters would go to the home in the mornings and the afternoons to check on Mother and Child. Before DCS's involvement, the family did not have such a plan in place—there was no oversight to ensure

Child's safety when in Mother's care. Hendricks County Sheriff's Corporal Evan Love accompanied Graham. Corporal Love testified that Mother

> didn't seem to be taking the whole situation very seriously. . . . She was laughing, she was more concerned about having male strippers from the Chippendales come out and do welfare checks on her to check to make sure she's okay and that the child's okay as opposed to a case worker or law enforcement or somebody else in the safety plan. . . . [S]he actually couldn't think of the term Chippendale's [sic] and she was more concerned about trying to figure out that actual term than paying attention to anything else that was going on.

*Id.* at 99-100.

[17] On December 28, 2016, Family Case Manager Rebecca Pitzer went to the family's residence to meet with the family. In front of Child, Mother made the following statements:

- "[Mother] was discussing how she has issues with her mother because . . . [Child's] the only grandchild that she's never had come over and stay the night at the maternal grandmother's house."
- "[Child] barely gets anything for Christmas as opposed to all these other kids in the family that do . . . ."
- "[Mother] said that her mother wanted her to have an abortion when she was pregnant with [Child] . . . ."
- "[Mother] had said that someone thought she was pregnant and she talked about . . . that she hasn't had sexual intercourse for several years . . . ."

*Id.* at 137-38. Pitzer was concerned by these "inappropriate" statements "seeing as how the child was sitting just a few feet away from her." *Id.* at 137. Father

was present, and several times during the conversation, he seemed to be "telling her to maybe slow down or calm down, not talk about it." *Id.* at 138. During the meeting, one of Mother's adult daughters called to confirm that Mother would be babysitting one of her toddler-aged grandsons. Mother "said that she wanted $5.00 so she could get wine basically because she was helping to watch the grandchild with [Father]." *Id.*

[18] Throughout the CHINS case, Mother refused to cooperate with DCS at all. She also refused to communicate with DCS. *Id.* at 113. At some point towards the end of 2016, Child's Court Appointed Special Advocate (CASA) reached out to Mother to schedule a time to meet with Child. When the CASA spoke with Mother, Mother seemed "upset," "agitated," "hostile," and "aggressive." *Id.* at 142-43. Mother refused to allow the CASA to speak with Child. The CASA reported back to her supervisor and stated that if she had to go out to the family's home at some point, "considering the hostility that was given towards me I didn't feel comfortable going out there by myself." *Id.* at 144.

[19] The factfinding hearing on the CHINS petition occurred on December 14, 2016, and February 2, 2017. Before the factfinding, Mother had participated in a substance abuse assessment, but the results of that assessment were not available at the time of the hearing. On April 28, 2017, the trial court found Child to be a CHINS, explicitly noting that it found all of DCS's witnesses to be credible. The trial court ultimately concluded as follows:

> [Child's] physical condition is seriously endangered as a result of the inability, refusal or neglect of the child's parents to provide

[Child] a sober caregiver when Father is out of town overnight. [Child's] physical health was seriously endangered due to Mother operating a vehicle while intoxicated with [Child] in the car. [Child] needs a sober caregiver to provide her supervision. Mother's continued use of alcohol and her lack of cooperation convinces the Court that Mother is unlikely to accept services for alcohol abuse without the coercive intervention of the Court.

Appealed Order p. 6-7. The parents now appeal.

# Discussion and Decision

## I. Standard of Review

Parents first argue that there is insufficient evidence supporting the trial court's order finding Child to be a CHINS. Our Supreme Court has explained the nature of a CHINS proceeding and appellate review of a CHINS finding as follows:

> A CHINS proceeding is a civil action; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.R.,* 919 N.E.2d 102, 105 (Ind. 2010). We neither reweigh the evidence nor judge the credibility of the witnesses. *Egly v. Blackford County Dep't of Pub. Welfare,* 592 N.E.2d 1232, 1235 (Ind. 1992). We consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. *Id.* We reverse only upon a showing that the decision of the trial court was clearly erroneous. *Id.*

> There are three elements DCS must prove for a juvenile court to adjudicate a child a CHINS. DCS must first prove the child is under the age of eighteen; DCS must prove one of eleven different statutory circumstances exist that would make the child

a CHINS; and finally, in all cases, DCS must prove the child needs care, treatment, or rehabilitation that he or she is not receiving and that he or she is unlikely to be provided or accepted without the coercive intervention of the court. *In re N.E.,* 919 N.E.2d at 105.

*In re K.D.,* 962 N.E.2d 1249, 1253–54 (Ind. 2012) (footnote omitted).

Here, DCS alleged that the child was a CHINS pursuant to Indiana Code section 31-34-1-1,[2] which provides as follows:

A child is a child in need of services if before the child becomes eighteen (18) years of age:

(1)  the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2)  the child needs care, treatment, or rehabilitation that:

(A)  the child is not receiving; and

(B)  is unlikely to be provided or accepted without the coercive intervention of the court.

Our Supreme Court has interpreted this provision to require "three basic elements: that the parent's actions or inactions have seriously endangered the

---

[2] DCS also alleged that Child was a CHINS pursuant to Indiana Code section 31-34-1-2, but the trial court found a CHINS based on section 1 and neither party makes any argument regarding section 2.

child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.,* 2 N.E.3d 1283, 1287 (Ind. 2014).

# II.  CHINS Finding[3]

## A.  Findings of Fact

[22]   The parents first argue that the evidence does not support many of the trial court's findings of fact.  We will consider each in turn.  *See* Appealed Order p. 3-6.

### *"Officer Cunningham tried to get Mother to cooperate and get a family member to come and pick up the children.  Mother was very uncooperative."*

[23]   The parents argue that while Mother was initially unwilling to provide contact information, her adult daughters were contacted and picked up the children at the scene.  Officer Cunningham testified that Mother was very uncooperative and verbally abusive, refusing to provide phone numbers for her adult daughters or allow the officer to look in her phone to find that information.  While the adult daughters did eventually arrive at the scene, there is no evidence regarding how they were contacted.  Throughout the encounter, Mother was agitated, loud, and verbally abusive, even physically assaulting Officer Howell at the

---

[3] At times, both parties cite to and rely on evidence that came into the record at the dispositional hearing following the CHINS adjudication.  As that evidence was not in the record at the time the trial court adjudicated Child to be a CHINS, we will not consider it.

hospital.  We find that the evidence supports this finding of fact regarding Mother's uncooperative behavior.

### *"When Officer Love arrived with FCM Graham, Officer Love noted that Mother appeared intoxicated."*

Initially, we note that it was Officer Wright who testified that Mother appeared intoxicated at a home visit, but this is merely an inadvertent error on the trial court's part that does not affect the substance of the finding.  Mother argues that she submitted to a mouth swab test that day that showed a blood alcohol content of .04-.08, which does not meet the legal level of intoxication for the purpose of operating a vehicle.  We agree with the State, however, that whether she meets the legal limit for being arrested for OWI does not mean that she did not appear—or was not—intoxicated.  Officer Wright stated that Mother was acting "angry" and "agitated" and admitted that she had been drinking that day.  Tr. p. 91.  We find that the evidence supports this finding of fact.

### *"FCM made several attempts to talk with Mother and went to the home three times before she was able to talk with Mother."*

The parents argue that it is "unclear whether it is unusual for DCS to have difficulty making contact with parents after a complaint had been filed" and that there "was no proof that the [parents] were avoiding contact with DCS." Appellants' Br. p. 14.  This argument in no way undercuts the trial court's finding, however, which makes a factually accurate statement, based on Graham's testimony, that Graham had to make several attempts at

communication before she was finally able to talk with the parents. The evidence supports this finding of fact.

> ***"Father was very calm. Father did not appear concerned with [Child's] safety."***

> ***"When FCM Graham talked with Father on the phone, he did not understand why he needed to be involved. Father did not show great concern for [Child]."***

[26] The parents contend that there is evidence in the record showing that Father was, in fact, concerned for Child. But this is merely a request that we reweigh the evidence, which we will not do. The record reveals that Graham testified that Father "was very calm," "he wasn't really expressing deep concern for his child," and stated that he had "no concern" about the fact that Mother was arrested for OWI while Child was in the car. Tr. p. 108, 121. The evidence supports these findings of fact.

> ***"Deputy Love observed that Mother did not take the situation seriously and she seemed more concerned about male strippers than [Child]."***

[27] The parents argue that this was merely an "ill-advised attempt at humor." Appellants' Br. p. 16. But Deputy Love did, in fact, testify that Mother "was more concerned about having male strippers from the Chippendales come out and do welfare checks on her . . . as opposed to a case worker or law enforcement or somebody else in the safety plan" and that Mother "was more concerned about trying to figure out [the term Chippendales] than paying attention to anything else that was going on." Tr. p. 99-100. The trial court explicitly found Deputy Love to be a credible witness. We decline the parents'

request to reweigh this evidence or assess witness credibility—the evidence supports this finding of fact.

> ***"DCS developed a safety plan with Mother's adult daughter . . . , who agreed to go and check on [Child] each morning and afternoon on the days Father is out of town."***

[28] The parents argue that they were also involved in developing and implementing the safety plan. Even so, the record establishes that no such safety plan had been developed or implemented before DCS became involved with this family. Until DCS stepped in, no one was making sure that Mother was sober while Child was in her care. We find the evidence supports this finding of fact.

> ***"Mother has been uncooperative with [Child's CASA]. Court finds [the CASA] credible."***

[29] The parents argue that Mother was misinformed about who the CASA was. But there is no evidence in the record supporting that assertion. The CASA testified that Mother was "upset," "agitated," "hostile," and "aggressive" and that Mother refused to allow the CASA to speak with Child. Tr. p. 142-43. The CASA was so alarmed by Mother's behavior that she told her supervisor she was not comfortable going to the family's home unaccompanied. The evidence supports this finding of fact.

## B. Conclusion that Child is a CHINS

[30] Finally, the parents argue that the evidence in the record does not support the trial court's conclusion that Child is a CHINS. As noted above, our Supreme Court has stated that to establish a CHINS, DCS must prove "three basic

elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *S.D.*, 2 N.E.3d at 1287.

## 1. Serious Endangerment

[31] The parents concede that the State proved this element of the CHINS statute by offering evidence regarding Mother's act of driving while intoxicated with Child in the car. Appellants' Br. p. 19.

## 2. Child's Needs Unmet

[32] It is undisputed that Mother is Child's primary caregiver most of the time. Father is nearly always out of town during the weekdays and weeknights. It is also undisputed that Mother drinks wine every day. It is true that consuming alcohol is not illegal and that consuming alcohol while having children in one's care is not illegal. It is certainly the case that not every child whose parents drink alcohol is a CHINS. Graham explained why the circumstances present in this case, in particular, are troubling:

> [Mother's] drinking, especially [in] this case where she was pulled over, was excessive and she had put her daughter as well as her granddaughter in danger by driving with them and she admitted to me that she drinks every day and because of [Father's] travel for work he's not there as a sober caregiver, a sober adult in the home and with [Mother] admitting that she drinks every day I can't—we did not feel that it was a safe location for [Child] to be without a sober caregiver.

Tr. p. 117-18.  On one occasion, Graham and an officer went to the family's home in the early afternoon, and Mother had already had three glasses of wine and a blood alcohol content of .04-.08.  The officer deduced, based on her behavior, that she was intoxicated.  Child told Graham that she knows Mother drinks wine and stated that "she acts different when she drinks wine." *Id.* at 126.

[33]  Furthermore, Father stated that Mother may have bipolar disorder, but there is no evidence that she has ever received any mental health treatment or medication for this condition.  Whether because of alcohol use, mental health issues, or other unknown factors, Mother displayed a pattern of concerning, obstreperous, and unstable behavior throughout the CHINS case:

- On the night Mother was arrested for OWI, she went to the emergency room and displayed such concerning behavior that a social worker was contacted.  Mother was angry, aggressive, and upset, accusing hospital employees of stealing a bank statement.
- After being pulled over by law enforcement, Mother was uncooperative, loud, verbally abusive, and combative.  She even physically struck one of the officers.
- In August 2016, Graham went to the family's home.  She found Mother to be agitated, angry, and disruptive.  Mother slammed the door at one point.
- In October 2016, Graham and Officer Wright went to the home.  Officer Wright believed Mother was intoxicated based on her angry and agitated behavior.  Mother, with Child next to her, said, "oh look at me, I'm so drunk[.]"  Tr. p. 92.
- On another occasion, Graham and Corporal Love went to the home.  Corporal Love did not believe that Mother was taking the situation seriously, stating that she was more focused on making jokes about the Chippendales than making sure her child was safe.

- In December 2016, Pitzer went to the residence. While she was there, with Child sitting a few feet away, Mother was unable to focus on the conversation with Pitzer about the case, instead making inappropriate and meandering statements about maternal grandmother, about pressure to abort Child when Mother was pregnant, and about how she had not had sex for several years. When Mother's adult child called to ask her to babysit for a grandchild, Mother demanded $5 so she could buy wine.
- Near the end of 2016, the CASA contacted Mother to find a time to meet with Child. Mother was agitated, hostile, and aggressive, causing the CASA to feel unsafe going to the home by herself.

In the face of all this troubling behavior, Father was absent and unconcerned. He did not understand why he had to be involved with the CHINS case and stated that he was not concerned about Mother's alcohol consumption or the fact that she was arrested for OWI with Child in the vehicle. He had taken no action to ensure Child's safety while he was traveling for work.

[34] It may well be that any one of these instances would not have been enough to rise to the level of a CHINS case, but in the aggregate, this evidence shows that Child did not have a sober, stable, and appropriate caregiver to care for her. In other words, the trial court did not err by concluding that DCS established that Child's need for appropriate supervision was not being met.

## 3. State Coercion

[35] Finally, the parents argue that DCS failed to prove that the coercive intervention of the court is needed because (1) they helped to develop the safety plan and were in compliance with that plan during the CHINS case, and

(2) Mother agreed to, and did, participate in a substance abuse assessment during the CHINS case.

[36] While we applaud the parents for cooperating at that minimal level, we cannot conclude that the rest of the evidence in the record supports their contention that they were compliant with DCS and otherwise managing the situation on their own. First, the parents failed to respond to Graham's initial attempts at communication (including voicemails, three visits to their residence, and a letter left at their residence) for nearly two weeks. Second, for a lengthy period of time during the CHINS case, Mother refused to communicate with Graham at all. Third, Mother's behavior throughout this case, including her behavior with law enforcement officers, hospital personnel, jail staff, the CASA, and DCS employees, was hostile, aggressive, and accusatory. Fourth, while Mother did participate in a substance abuse assessment, she has taken no steps to address her substance abuse issues (which have lasted for years, if her past OWI conviction is any indicator). Fifth, she has likewise taken no steps to address her mental health issues. Sixth, Father is not concerned about the situation and has showed no initiative in attempting to solve these problems without the intervention of the State. Seventh, the safety plan put in place, which entails one of their adult daughters stopping by the house twice a day, is merely a short-term solution to ensure Child's safety, but does not address the underlying problems, which neither Mother nor Father have seen fit to address until DCS got involved. Under these circumstances, we find that the trial court did not err by finding that DCS had proved that the coercive intervention of the court was

necessary.[4]  In sum, we find the evidence sufficient to support the trial court's adjudication of Child as a CHINS.

[37] The judgment of the trial court is affirmed.

Bailey, J., and Altice, J., concur.

---

[4] The State includes argument in its brief regarding the trial court's dispositional order and the services it ordered parents to complete.  Parents make clear in their reply brief, however, that they are not contesting the services ordered at the dispositional hearing.  Consequently, we will not address this issue.